# IN THE COURT OF APPEALS OF IOWA

No. 25-0477
Filed September 4, 2025

**IN THE INTEREST OF I.L.,**
**Minor Child,**

**A.R., Mother,**
  Appellant.

_____

Appeal from the Iowa District Court for Polk County, Kimberly Ayotte, Judge.

A mother appeals the order terminating her parental rights to her two-year-old son. **AFFIRMED.**

Lynn Vogan of Juvenile Public Defender, Des Moines, for appellant mother.

Brenna Bird, Attorney General, and Mackenzie Moran, Assistant Attorney General, for appellee State.

Felicia Bertín Rocha of Bertín Rocha Law, PC, Urbandale, attorney and guardian ad litem for minor child.

Considered without oral argument by Tabor, C.J., and Greer and Buller, JJ.

**TABOR, Chief Judge.**

I.L.'s mother, Angelica, gave this poignant explanation for waiting over a year to seek mental-health and substance-use treatment after her young son was removed from her care: "I lost myself in addictive use, honestly. As an addict, we don't realize that we're letting not only ourselves down, but our child. He was taken away, and I felt like my world had ended. I dug myself a bigger hole instead of trying to climb out."

Angelica now challenges the order terminating her parental rights to her son—born in August 2022.[1] She does not contest the grounds for termination. When asked at the February 2025 termination hearing if I.L. could be returned to her custody, she candidly responded: "No, not at the moment I wouldn't suggest because I don't have a stable home for him yet due to the fact that I am going to give birth any week now." Instead, she argues that termination was not in I.L.'s best interests and that a bridge order would have been appropriate under Iowa Code section 232.103A (2024).[2] On both points, we agree with the juvenile court's well-reasoned termination order and affirm.[3]

## I.      Facts and Prior Proceedings

In April 2023, Angelica was using methamphetamine while caring for her eight-month-old son. When I.L.'s father, Carlos, tried to take the toddler from the

---

[1] The department asked for custody to be placed with I.L.'s father Carlos after the termination of Angelica's rights.

[2] That code section allows the juvenile court to close a child-in-need-of-assistance (CINA) case by transferring jurisdiction over the child's custody, physical care, and visitation to the district court through a "bridge order" if certain criteria are met.

[3] We review termination proceedings de novo. *In re L.B.*, 970 N.W.2d 311, 313 (Iowa 2022). We give weight to the juvenile court's factual findings but are not bound by them. *Id.* Our paramount concern is the child's best interests.

home, Angelica struck Carlos in the face.[4]  In response, the Iowa Department of Health and Human Services developed a safety plan for the family.  But when the parents did not comply with the plan, the department sought court approval to remove I.L. from their custody.  That summer, the court adjudicated I.L. as a child in need of assistance (CINA), and the department placed him in foster care.

As the juvenile court noted, "Angelica was slow to engage in services."  She continued to use methamphetamine until March 2024.  That month she was arrested with a man named Joshua and charged with marijuana possession.  Angelica acknowledged that Joshua was her "on and off" paramour and was possibly the father of the baby that she was expecting at the time of the termination hearing.  Finally, in June 2024, as part of her probation, Angelica had a substance-use evaluation.  Her diagnosis was methamphetamine and cannabis use disorder, severe.  She successfully completed a treatment program called Fresh Start.  But she did not engage in individual mental-health therapy until the month before the final termination hearing.

And her relationship with Joshua raised red flags.  Because he has a criminal record and uses drugs, the department case manager considered Joshua unsafe to be around I.L.  Yet despite directives from her probation officer not to contact Joshua, Angelica communicated with him and was untruthful about their continuing interactions.

---

[4] The State charged Angelica with domestic abuse assault.  She pleaded guilty and was placed on probation for two years and ordered to have no contact with Carlos until 2028.

By contrast, Carlos tested negative for drugs throughout the CINA case. He had unsupervised visits, and I.L. was comfortable in his care. But in the fall of 2023, Carlos had a serious car accident, requiring surgeries for brain and foot injuries. He moved to Tennessee where his family cared for him. Fortunately, Carlos fully recovered from the injuries and was ready to resume custody of I.L.

In April 2024, the department recommended that a petition be filed to terminate Angelica's parental rights and that Carlos be given six more months to reunify with I.L. Carlos was still living in Tennessee but had daily video calls with his son. The delay was necessary to complete a home study in Tennessee under the interstate compact on the placement of children (ICPC). Changing course, at the May 2024 permanency hearing, the department recommended a six-month extension for both parents, along with a bridge order to set custody. The juvenile court granted the extension for Carlos but ordered the guardian ad litem (GAL) to file a petition to terminate Angelica's parental rights.

The GAL petitioned for termination of the mother's rights in July 2024. A hearing on the petition was delayed so the ICPC home study could be completed. When the ICPC was denied, Carlos returned to Iowa to be available for his son. After his return, the two-day termination hearing occurred in December 2024 and February 2025. At the hearing, Angelica requested supervised visitation with I.L. and a bridge order. In her words: "All I am asking is for my rights not to be terminated. I would like to have a chance to be in my son's life, watch him grow."

The department took a different position. The case manager recommended custody be placed with Carlos, who already had overnight visitation with his son. Carlos could provide for all of I.L.'s needs, and the child was "very happy" in his

care. The department no longer supported a bridge order, pointing to Angelica's continuing instability. The caseworker also relayed Carlos's preference for termination of Angelica's parental rights over a bridge order: "He has stated that he feels like she will continue to reach out and not leave him alone, that she will try to seek him out and that he will forever have to worry about her following him or finding him."

In a March 2025 order, the juvenile court terminated Angelica's parental rights under Iowa Code section 232.116(1)(h). She appeals.

## II. Analysis

Termination proceedings involve three steps. *In re A.B.*, 957 N.W.2d 280, 294 (Iowa 2021). First, we assess whether the State has proven a statutory ground for termination under Iowa Code section 232.116(1). *Id.* Second, we examine whether termination is in the child's best interests under section 232.116(2). *Id.* And third, we decide whether a permissive factor under section 232.116(3) precludes termination. *Id.*

We need not address the first step here because it is not disputed. *See In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010). We also find that, despite citing section 232.116(3)(a) and (c), Angelica has waived the third step by not analyzing those factors in her petition on appeal.[5]

---

[5] "Conflating the second and third steps based on a claimed bond with the child is not uncommon." *See In re L.A.*, 20 N.W.3d 529, 534 (Iowa Ct. App. 2025). And we consider the parent-child bond as a part of the best-interests analysis at step two. *Id.* at 535. But unlike the child's best interests, the burden to show an exception to termination under section 232.116(3) rests with the parent. *See In re A.S.*, 906 N.W.2d 467, 476 (Iowa 2018). And because Angelica offers no argument to satisfy that burden, she waives it on appeal. *See Hyler v. Garner*, 548

## A. Best Interests

Pointing to her progress with services during the late stages of the CINA case, Angelica contends termination of her parental rights is not in I.L.'s best interests. She disagrees with the juvenile court's findings that she lacks insight into the harm to I.L. caused by her prolonged substance use and acts of domestic violence. She stresses that "[s]he has demonstrated months of sobriety and a desire to be available for her son."

When deciding best interests, we track the language of section 232.116(2). *P.L.*, 778 N.W.2d at 37. We give primary consideration to I.L.'s safety, to the best placement for fostering his "long-term nurturing and growth," and to his "physical, mental, and emotional condition and needs." Iowa Code section 232.116(2). We also recognize that severing I.L.'s bond with Angelica may affect his emotional health. *See L.A.*, 20 N.W.3d at 535.

We appreciate the recent efforts that Angelica has made to deal with her addiction. But by her own admission, she waited for over a year to start addressing her substance use and mental health. And during that year, her drug use stood in the way of her building "a proper bond" with her son, though she testified that their bond is "much stronger now than it was."

Even accepting Angelica's progress with her substance use and mental health, another concern looms. Angelica has a new paramour with his own history of substance use and domestic violence. As the juvenile court recounted: "Angelica testified that she would not allow [her paramour] to care for [I.L.] because

---

N.W.2d 864, 876 (Iowa 1996); *see also* Iowa Rs. App. P. 6.201(1)(d); 6.1401– Form 5.

she didn't want it to look bad." But "[s]he was unable to articulate the actual risk" of engaging in the relationship. The record shows that Angelica can neither now nor any time soon offer I.L. the stability he needs for healthy growth. Because her unsafe parenting continues to pose risks to I.L., termination promises a more certain future. On this record, the State satisfied the best-interests requirement.

## B. Bridge Order

Next, Angelica argues that the juvenile court should have entered a bridge order under Iowa Code section 232.103A(1). She links this argument to the previous one: "Assuming that the [juvenile court] erred in finding that termination of parental rights was in the child's best interest, the mother argues that a bridge order is the appropriate alternative to termination."

Although we have found that termination was in I.L.'s best interests, we briefly address the bridge-order option. Here's the juvenile court's thinking:

> [A] Bridge Order relies upon the parents demonstrating the ability to follow the expectations of custody and visitation. This mother's past performance is the best predictor of the future. She has a history of domestic violence with the father. She violated the No Contact Order between them. A No Contact Order remains in place regarding their contact. The father supports the termination of her parental rights. She violated the terms of the [department's] Safety Plan. Her failure to follow through with the Safety Plan led to [I.L.]'s removal from her care. As part of her probation, Angelica is not to have contact with her paramour who is also the potential father of her unborn child. Angelica has continued to maintain contact with the paramour. Angelica has used deceptive measures to try to hide her contact. Even after testifying that she understood the risk of continuing a relationship with her paramour, Angelica maintained frequent contact with him. She does not demonstrate insight into why he poses a risk to her or to children. Based on her actions and her lack of credibility, the court cannot find that a custodial order would provide sufficient legal protection for [I.L.].

Entry of a bridge order is not the preferred solution when there is long-standing discord between the parents. *In re B.L.*, No. 24-1321, 2024 WL 4965955, at *3 (Iowa Ct. App. Dec. 4, 2024). We agree that a bridge order is not in I.L.'s best interests.

**AFFIRMED.**